HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

TIMOTHY COURCHAINE
United States Attorney
District of Arizona

ROBERT J. KEENAN
Acting Deputy Assistant Attorney General
Civil Rights Division

ERIC V. NEFF
Acting Chief, Voting Section
Civil Rights Division

JONATHON P. HAUENSCHILD
Trial Attorney, Voting Section
Civil Rights Division
4 Constitution Square
150 M Street NE, Room 8.1134
Washington, D.C. 20002
Jonathon.Hauenschild@usdoj.gov
Tel. (202) 215-2110

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| United States of America, | |
|---|---|
| Plaintiff, | |
| v. | Case Number: 2:26-cv-00066-SMB |
| Adrian Fontes, in his Official Capacity as Secretary of State for the State of Arizona, | **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS (DOC. 25) AND REPLY IN SUPPORT OF ITS MOTION TO COMPEL (DOC. 7).** |
| Defendant(s). | |

## I.   INTRODUCTION

The Attorney General of the United States brought this case as part of her investigation of Arizona's list maintenance practices under the Help America Vote Act ("HAVA") and the National Voter Registration Act ("NVRA"). Pursuant to Title III of the Civil Rights Act (CRA), she sent a written demand to Defendant Fontes for copies of election records under his custody or control, citing the CRA as the basis for the demand

and indicating that the purpose was to investigate the State's compliance with other federal election laws. The Defendant refused to comply with the written demand. The Department of Justice instituted this action to enforce its rights under the CRA. Compl., Doc. 1.

## II.     STATUTORY AND FACTUAL BACKGROUND

As discussed in the Motion to Compel (Doc. 7) and Complaint (Doc. 1), Title III of the CRA forms the basis for this action to compel the production of election records. *See* Doc. 1, ¶¶. 1-4, 16-18; Doc. 7 at 2-3. The statutory background provisions are incorporated herein by reference.

The CRA creates a "special statutory proceeding," which the Attorney General through the Civil Rights Division of the Department of Justice may file to compel the production of election records. When filed and granted by this Court, Defendant must produce the voter registration lists and other federal election records demanded. *Kennedy v. Lynd*, 306 F.2d 222, 225 (5th Cir. 1962), *cert denied* 371 U.S. 952 (1963).[1] The court in *Lynd* reasoned that this special proceeding was necessary to obtain federal election records because no other procedural device or maneuver was available. *Id*. at 226. Title III is a unique provision of federal law because it is purely an investigative tool. As such, it enables the Attorney General to determine whether a federal lawsuit "should be instituted" and "to obtain evidence for use in such cases if and when filed." *Id*. at 228.

The CRA restricts the Court to a "severely limited" inquiry: (1) did the Attorney

---

[1] Circuit caselaw addressing the CRA in any depth has been confined to courts within the Fifth Circuit in the early years following the CRA's enactment. The United States is unaware of any circuit courts disagreeing with the Fifth Circuit's approach to the CRA. As noted in Def.'s Mot., three district courts reached contrary conclusions. However, those decisions are burdened by erroneous applications of the statute and have been appealed. *United States v. Benson*, No. 1:25-cv-01148-HYJ-PJG, 2026 WL 362789 (W.D. Mich., Feb. 10, 2026), appeal docketed, No. 26-1225 (6th Cir. Mar. 3, 2026), *United States v. Oregon*, Case No. 6:25-cv-01666-MTK, 2026 WL 318402 (D. Or., Feb. 5, 2026), appeal docketed, No. 26-1231 (9th Cir., Mar. 3, 2026); *United States v. Weber*, Case No. 2:25-cv-09149-DOC-ADS, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026) appeal docketed, No. 26-1232 (9th Cir., Feb. 25, 2026).

General make a written demand for federal election records stating the basis and purpose; (2) was that demand made to one or more "officer[s] of election" responsible for performing any act requisite to voting in federal elections including voter registration; (3) did the officer(s) of election fail or refuse to make the demanded federal election records "available for inspection, reproduction, and copying"; and (4) did the Attorney General make "a simple statement" to the Court that she satisfied the first three elements. *Id*. at 225-26; *see also* 52 U.S.C. § 20703.

The Department of Justice sent Secretary Fontes written demands compelling production of the State's voter registration database (VRDB) for inspection. *See*, Doc. 1, ¶¶ 19-28, Doc. 7 at 3, Neff Decl. in Support of Mot. to Compel, Doc. 8-5 at ¶¶ 4-10. Despite granting him an extension, the Secretary refused to comply with the demand. Doc. 1 at ¶ 29, Doc. 7 at 3. *See also*, Neff Decl., Doc. 8-5, ¶ 11. The basis for the demand was twofold: Title III of the CRA and several counties' failure to provide accurate data for the Election Assistance Commission's Election Administration and Voting Survey (EAVS). Doc. 8-1 at 2, Doc. 8-3 at 1-2. The purpose was to "ascertain Arizona's compliance with the list maintenance requirements of the NVRA and HAVA." Doc. 8-3 at 2. The letter explained that the list is subject to federal privacy protections, specifically Section 304 of the CRA. Id. at 2. The Defendant responded on August 29, 2025, citing state and federal privacy concerns and stating that he would not provide a copy of the VRDB. *See* Doc. 8-4.

The record before the Court demonstrates that the United States has satisfied each of these requirements. Therefore, the United States' Motion to Compel (Doc. 7) should be granted, the Motion to Dismiss (Doc. 25) should be denied, and this Court should enter an order compelling production of Arizona's VRDB and other responsive federal election records.

### III.     ARGUMENT

Defendant misapprehends the nature of a CRA claim by erroneously suggesting the Court should apply the Federal Rules of Civil Procedure to the demand for records under the CRA. He incorrectly maintains that Title III of the CRA applies to only discrimination

claims and that State law displaces the CRA. He asks the Court to ignore caselaw under the CRA, focus only on selected provisions of the legislative history of the CRA, and allow an impermissible challenge to the basis and purpose of the Attorney General's written demand. Finally, Defendant improperly cites the Privacy Act, the E-Government Act, and the Driver's Privacy Protection Act (DPPA) as preventing disclosure of election records. Throughout his Motion, Defendant relies on three cases denying the United States state voting records. For the reasons discussed below, Defendant's Motion to Dismiss (Doc. 25), should be denied.

**A. The FRCP Does Not Apply to Title III's Summary Proceedings.**

The purpose of Title III "is to facilitate the investigation of the records *before suit is filed*." *United States v. Ass'n of Citizens Councils of La.*, 187 F. Supp. 846, 847 (W.D. La. 1960) (per curiam) (emphasis added). "[T]he function sought to be exercised by the Attorney General is … purely investigative." *Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 854 (M.D. Ala. 1960), *affirmed sub nom. Dinkens v. Attorney General*, 285 F.2d 430 (5th Cir. 1961), *cert denied* 366 U.S. 913 (1961). The Attorney General's authority allows her to evaluate "possible violations of a Federal statute," *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (per curiam) ("*Coleman II*"), *cert denied* 373 U.S. 950 (1963). [2] It does not require known violations of federal law. In that manner, Title III enables the Attorney General to determine whether a federal lawsuit "should be instituted" and "to obtain evidence for use in such cases if and when filed." *Lynd*, 306 F.2d at 228. Courts should treat an action brought under Title III as a "summary proceeding," which the court, "with expedition, should grant the relief sought. *Lynd*, 306 F.2d at 228.

---

[2] Title III invests the Attorney General with a power akin to a grand jury which "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *United States v. Bisceglia*, 420 U.S. 141, 148 (1975), *see also United States v. Powell*, 379 U.S. 48 (1964); *United States v. Morton Salt Co.*, 338 U.S. 632 (1950).

When Defendant argues that the Federal Rules of Civil Procedure govern these proceedings, he repeats what the Fifth Circuit described as "a basic misconception… concerning a Title III proceeding." *See* Def.'s Mot. at 1. *Lynd*, 306 F.2d at 225.

In structuring the CRA the way in which it did, Congress indicated that the Federal Rules of Civil Procedure are inapplicable. "Since it is a special statutory proceeding, it does not require pleadings which satisfy usual notions under the Federal Rules of Civil Procedure." *Id.* at 225-26; *see also Gallion*, 187 F. Supp. at 854 (comparing CRA applications to compel to actions by the Securities and Exchange Commission in which procedural rules "are made specifically inapplicable to investigations").

The summary, expedited approach makes sense. The United States cannot be expected to effectively enforce federal election laws such as the NVRA and HAVA if the Attorney General is required to allege facts from federal election records that state officers of election have denied to her. *See Lynd*, 306 F.2d at 227 (the Attorney General's "right to records does not require that [she] show [she] could win without them").

### B. Title III is Not Limited to Investigating Racial Discrimination.

Nothing in Title III predicates its enforcement on racial discrimination. Instead, Congress deliberately omitted race, which entitles the Government to election records upon demand. Notwithstanding the CRA's plain language, the Defendant argues that the only permissible basis for a Title III request is to investigate potential racial discrimination and maintains that assessing a State's compliance with HAVA and the NVRA do not do so. Def.'s Mot. at 5-9. To support this proposition, which even the *Benson* court rejected, Defendant relies solely on selected quotes from the Civil Rights Act of 1960's legislative history and irrelevant cases.[3]

---

[3] "[I]t is not only… improper but also quite unnecessary to seek repeated support in the words of a Senate Committee Report—which, as far as we know, not even the full committee, much less the full Senate, much less the House, and much much much less the President who signed the bill, agreed with." *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 267 (2004) (Scalia, J., concurring).

As the *Benson* court did, this Court should reject the Defendant's invitation to engraft a racial component to Title III. That court concluded the CRA cannot be rewritten to restrict the statute's scope, observing that "the CRA's text includes no such limitation…" *Benson*, 2026 WL 362789, *8. Further, the court noted, "[t]here is no rule of statutory interpretation that prevents a statute from interacting with, or being used in conjunction with, subsequently enacted statutes," such as the NVRA and HAVA. *Id*.

Where, like with Title III, the language of an enactment is unambiguous, "the words employed are to be taken as the final expression of the meaning intended." *United States v. Mo. Pac. R.R. Co.*, 278 U.S. 269, 278 (1929), *see also*, *Intel Corp.*, 542 U.S. at 267 (Scalia, J., concurring). Principles of statutory construction foreclose federal courts from rewriting a statute in a manner that better suits a litigant. As the Supreme Court explained, "[t]he judicial function to be exercised in construing a statute is limited to ascertaining the intention of the Legislature therein expressed. A *casus omissus* does not justify judicial legislation." *Ebert v. Poston*, 266 U.S. 548, 554-55 (1925), *see also Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 654-55 (2020).

Congress made clear in the CRA and other civil rights statutes where it intended a remedy to be limited to racial discrimination. *See*, *e.g.*, Section 601 of the CRA, P.L. No. 86-449, 74 Stat. 90;[4] U.S.C. § 2000e-2;[5] 52 U.S.C. §§ 10301-10306, 10309;[6] 42 U.S.C. §§

---

[4] Applying Title VI of the CRA to violations of rights "on account of race or color." Codified as amended at 52 U.S.C. § 10101.

[5] Title VII of the CRA of 1964 prohibiting employment practices "because of such individual's race, color." The cases cited by the Defendant within Title VII's or the Civil Rights Act of 1964's rubric. *See* Def.'s Mot. at 6, *United Steelworkers of America, AFL-CIO-CLC v. Weber*, 443 U.S. 193, 197 (1979) (reciting Title VII of the CRA of 1964 as the statute central to the case), *Doe v. Kamehameha Sch./Vernice Pauahi Bishop Est.*, 470 F.3d 827, 834 (9th Cir. 2006) (noting that the plaintiffs alleged defendants violated Title VII of the CRA of 1964).

[6] Voting Rights Act of 1965 prohibits discrimination "on account of race, color," or language minority status.

3604-3606, 3617.[7] No such language limiting Title III of the CRA to voting rights violations based upon racial discrimination appears anywhere in the statutory text. *See* 52 U.S.C. §§ 20701-20706.

The long-accepted rules of statutory construction prohibit a court from adding conditions to federal law when Congress omitted those conditions. Consequently, the United States respectfully submits that the Court decline Defendant's invitation to rewrite the CRA to add a requirement of racial discrimination that simply does not exist in Title III.

### C. Defendants cannot challenge the Attorney General's basis and purpose to investigate Arizona's HAVA and NVRA compliance.

Defendant argues that the United States failed to provide a sufficient statement of the basis and purpose of its request for federal election records. He criticizes the Attorney General's basis and purpose either as insufficient or as conflicting "with its stated purpose in demanding Arizona's VRDB." Def.'s Mot. at 9. The *Oregon* and *Weber* courts improperly found that the Government may be "laying the ground work to amass the personal information of millions of Americans in a centralized database," relying on hearsay from some intervenors. *Weber*, 2026 WL 118807, *11 (relying on "[r]eports from other agencies also point[ing] to the federal government laying the groundwork" for the alleged database). Nothing could be further from the truth.[8] The VRDB is necessary to perform an *individualized* assessment of the State's compliance with NVRA and HAVA. 2d Neff Decl. ¶ 6.

Defendant argues, in part, that NVRA and HAVA compliance could not form a basis for the request because state law already requires collection of documentary proof of

---

[7] Fair House Act of 1968 prohibits discrimination in housing or rentals "because of "race, color … or national origin."
[8] The U.S. District Court for the Eastern District of North Carolina found accusations that the Government is "developing a national voter file" to be "speculative and premature." Order denying Reconsideration of Motion to Intervene, Jan. 12, 2026, attached as Ex. 6 to 2d Neff Decl.

citizenship before being registered to vote. Def's Mot. at 10. The United States has four responses to this last assertion: First, federal courts have determined that Section 303's written demand requirement "contain a statement of the basis and the purpose therefor" "means only that the Attorney General [must] identify in a general way the reasons for [her] demand." *Coleman II*, 313 F.2d at 868. "Clearly a sufficient statement would be the assertion that the demand was made for the purpose of investigating possible violations of a Federal statute" *Id.* (emphasis added). Second, the law applies only to state registration forms. Ariz. Rev. Stat. §§ 16-121.01, 16-123, 16-127(A). Third, the DPOC does not apply to elections for federal office. Ariz. Rev. Stat. §§ 121.01(C), 16-127(A), *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 17-20 (2013). Fourth, Defendant omits that the 9th Circuit has enjoined Arizona law's requirements for DPOC. *Mi Familia Vota v. Petersen*, 129 F.4th 691 (9th Cir. 2025), *pet. for cert. filed*, Nos. 25-1017, 25-109, 25-1022 (U.S.). Because of these distinctions, the United States' demand to inspect the VRDB is well-founded and the basis and purpose have been sufficiently stated.

With respect to the first response, the United States satisfied that requirement by stating, "[t]he purpose of the request is to ascertain Arizona's compliance with the list maintenance requirements of the NVRA and HAVA." [9] Doc. 8-3 at 1-2. Defendant's references to Ninth Circuit cases are inapposite, citing to separate, irrelevant federal laws. Defendant's motion to dismiss the CRA claim for not meeting an elevated showing of statement of "the basis and the purpose" fails under the plain language of the statute and the early cases addressing that very question.

---

[9] Through HAVA, Congress required prospective voters to provide either their driver's license number or last four digits of their social security numbers as identifiers to protect them, especially from allegations of duplicate registrations. *See* Nat'l Comm'n on Fed. Election Reform, To Assure Pride and Confidence in the Electoral Process 32-33 (Aug. 2021) (discussing the potential differences between a "Joseph Smith" and "Joe Smith" in voter lists) (excerpts provided as Neff Decl., Ex.11). *See also,* H.R. Rep. 107-329, pt. 1, at 36 (2001).

### D. Arizona's VRDB falls within Section 301's broad definition of "all records and papers" relating to registration to vote in federal elections.

The scope of federal election records covered by Title III of the CRA is established by Congress. Section 301 of the Act provides that the retention and production requirements apply to "*all records and papers*" which "come into … possession" of an election officer of election "relating to any application, registration, payment of poll tax, or other act requisite to voting" in a federal election. 52 U.S.C. § 20701 (emphasis added).

Federal courts that have applied Section 301 concluded that Congress meant what it said in the statute. Title III does not exclude production of electronic or non-public records or what a state may deem to be private or confidential information. One court explained in detail why a similar effort to impede the Attorney General's enforcement of federal election laws failed:

> There is nothing uncertain about that part of the Act requiring preservation and production of all records and papers which are in the possession of an election official … if those records and papers relate to the acts requisite to voting…. Regardless of when these records came into the possession of the election official, under Section 301 they must be retained and preserved for a period of twenty-two months.

*Gallion*, 187 F. Supp. at 855 (quoting 52 U.S.C. § 20701). In *Lynd*, the Fifth Circuit likewise recognized that "the papers and records" covered by Section 301 "have been specifically identified by Congress." 306 F.2d at 226. This requirement "is sweeping." *Id*. It applies to "all records and papers," as the statute provides, *id.*, and cannot be circumvented in the manner that Defendant suggest nor can he artificially narrow the scope of the request or qualify his production in any manner not specified in Title III. *Kennedy v. Lewis*, 325 F.2d 210 (5th Cir. 1963), *cert. denied* 377 U.S. 932 (1964).

While the *Benson* court mostly agreed with the United States regarding the summary nature of a Title III proceeding, it reached a few atextual conclusions. Relevantly here, the court read Section 301 narrower than Congress intended. *Benson*, 2026 WL 362789 *9-10. The United States respectfully disagrees; no other federal court has adopted such a

limitation. A court that addressed the scope of records to be produced similarly refused to impose an artificial limit. *Lewis*, 325 F.2d at 212. Such a reading carves out vast numbers of federal election records, which was plainly not Congress's intent when passing Title III. *Lynd*, 306 F.2d at 226.[10]

Moreover, Federal courts addressing similar provisions of federal election law interpret election records expansively. The District of Maryland, for example, when asked by a private, nongovernment party, found that the "focus on the information sought" was significant "rather than the particular language used to characterize that information" when interpreting the NVRA. *Judicial Watch v. Lamone*, 399 F. Supp. 3d 425, 440 (D. Md. 2019) (citing *Project Vote v. Kemp*, 208 F.Supp.3d 1320, 1329 (N.D. Ga. 2016) (court rejected defendant's argument that plaintiff could not obtain voter list). With that focus on the information sought, the state's voter registration list qualified as election records. *Id*. at 434. *See also, Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 337 (4th Cir. 2012) (holding that "all records" under Section 8(i)(1) for request by private, third party included voter registration records).[11] A case Defendant cites also supports the expansive definition of election records. *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36 (1st Cir. 2024).[12]

---

[10] According to the data that Arizona did report to the U.S. Election Assistance Commission, it is doubtful that hundreds of thousands of federal voter registration records exist in any medium other than electronic form. A large percentage of voter registration transactions were reported through online and Motor Vehicle methods. *See* U.S. Election Assistance Comm'n, EAVS Data Interactive 2024, *available at* https://www.eac.gov/research-and-data/studies-and-reports/eavs-data-interactive (last visited March. 13, 2026).

[11] During his discussion on the Privacy Act, Defendant seems to suggest – under State law – that the VRDB would qualify as an election record as otherwise defined by Title III of the CRA. Def.'s Mot. at 13 *citing* Ariz. Rev. Stat. 16-168(C), (F).

[12] Defendant cited for the proposition that he does not need to provide the unredacted VRDB. However, *Bellows* supports the proposition that Congress used the term "all records" to define the term expansively including VRDBs. 92 F.4th at 48. The case discussed NVRA enforcement under 52 U.S.C. § 20510(b) relating to private enforcement rather than subsection (a), enforcement by the Attorney General.

1  Def.'s Mot. at 17.  Defendant primarily cites various state and federal privacy laws along
2  with a single case addressing whether a *private entity* can access VRDBs under NVRA.
3        The *Benson* court misinterpreted the term "comes into possession," referring to it as
4  a "pedantic distinction" and faulting Congress for the confusion. *Benson*, 2026 WL 362789,
5  *9-11.[13] Contrary to the court's opinion, the ordinary application of the term means that an
6  election officer "come[s] into … possession" of any record or document the moment that
7  he "get[s]" or "acquire[s]" it and retains it within his control regardless of its source or
8  creator.  *Webster's New World Dictionary of the American Language* 291, (8th coll. ed.
9  1960) (8th coll. ed. 1960) *see id.* at 1140 (defining "possess" and "possession").
10       The *Benson* court's focus on the word "come" cannot create a carve-out for self-
11 generated documents. Congress used the phrase "*come* into his possession" rather than "*are*
12 in his possession," not to impose an unwritten carve-out for records or documents that are
13 self-generated, but to focus on *how* and *when* the officer gains possession of the records or
14 documents in the first instance. *See Webster's Third New International Dictionary* 453
15 (1966 ed. unabridg.) ("to enter upon or into possession of:  acquire esp. as an inheritance").
16 Following this focus on the *when* and *how* an individual gains possession of a record or
17 paper, 52 U.S.C. § 20701 places a duty of retention and preservation only on those officers
18 who acquire a record or paper in the course of administering one of the elections mentioned
19 in that provision—and then only "for a period of twenty-two months from the date" of that
20 same election.
21       This understanding of possession is consistent with previous efforts going back
22 decades to obtain statewide voter registration lists under Title III, including in litigation.[14]

---

[13] The court expressed some discomfort at its conclusion, acknowledging that it was possible that "the distinction between voter registration applications and voter registration lists is *overly* pedantic…"2026 WL 362789, *10 (emphasis added).

[14] *See* Compl., *United States v. Georgia*, No. 1:06-cv-02442 (N.D. Ga. Oct. 12, 2006), Doc. 1. The Court entered a consent decree in the Georgia case requiring production of the SVRL. *See Georgia*, *supra*, at Doc. 4 (filed Oct. 27, 2006). For the Court's convenience, the two documents are provided herein as 2d Neff Decl. ¶¶ 8-10, Exs. 7 and 8.

To ascertain whether a jurisdiction engages in practices that violate federal law (whether HAVA, the NVRA, the Voting Rights Act or any other one), the Attorney General needs to examine both applications to register to vote *and* the final voting rolls, including the electronic VRDB, so as to assure herself that the applications are being properly processed and that reasonable list maintenance efforts have been practiced. *See* 2d Neff Decl. ¶¶ 3-4, Exs. 9-10. Limiting the Attorney General's ability to anything other than *all records* would make it nearly impossible for her to carry out the duties assigned to her by Congress.

Nowhere does Title III limit the information the Attorney General may receive. NVRA allows the Attorney General to "bring a civil action in an appropriate district court for such declaratory or injunctive relief as is necessary to carry out this chapter" and provides that the "rights and remedies established by this section are in addition to all other rights and remedies provided by law." 52 U.S.C. § 20510(a), (d)(1).

**E. Title III Provides for Its Own Enforcement and Does Not Include Language Protecting Taxpayers**

Through Title III, Congress provided the Attorney General with broad investigative powers unconstrained by limitations found in other statutes. When compared to at least one other statute, Title III's enforcement mechanisms and the errors of the two Ninth Circuit district courts become clear. Defendant's reliance on the cases is, thus, misplaced.

As discussed in *Powell*, because the Internal Revenue Code (IRC) fails to specify any procedure for its enforcement and prohibits the Government from subjecting a taxpayer "to unnecessary examination or investigations," the FRCP applies and courts can examine the purpose for which a summons has been issued. *See* 26 U.S.C. § 7605(b), *Powell*, 379 U.S. at 58, n. 18. Title III lacks similar language. It also specifies the procedure she must take to obtain a judicial order, with the only qualifying language requiring a written demand for records and its rejection prior to initiating legal process. *See* 52 U.S.C. §§ 20703, 20705. The CRA does not provide any process for election officers to object to Title III proceedings, unlike the IRC's provisions protecting taxpayers. *Compare* 26 U.S.C. § 7605(b) with 52 U.S.C. § 20705.

12

Despite the textual differences, *Powell* supports the Government's position that the CRA, NVRA, and HAVA form adequate bases and purposes for Title III. Though IRC investigations are constrained to prevent abuse of the taxpayer, the Supreme Court deferred to the Government's judgment both as to the necessity of the investigation and the category of records sought. The Government's investigation "'does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, *or even because it wants assurance that it is not*.'" *Powell*, 379 U.S. at 57 (quoting *Morton Salt*, 338 U.S. at 642-43) (emphasis added).

### F. The Civil Rights Act, NVRA, and HAVA Preempt State Law

The Defendant argues that he is bound by state law to not comply with the Attorney General's written demand. *See* Def.'s Mot., at 1-2, 13-17. He further argues that those laws supplant federal law or otherwise are not preempted by the CRA, NVRA, or HAVA. *Id*. at 1, 17. His reliance on state law is misplaced as courts have long recognized that the Elections Clause of the Constitution allows Congress to preempt state law. *E.g. Arizona*, 570 U.S. at 19-20 (holding that Arizona law requiring documentary proof of citizenship for registrations submitted using the federal form was preempted by the NVRA).

The Elections Clause provides, "The Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations." U.S. Const. art. I, § 4, cl. 1. The Elections Clause occupies something of a unique space in the Constitution because it is a

> default provision; it invests the States with responsibility for the mechanics of congressional elections, but only so far as Congress declines to preempt state legislative choices, Thus, it is well settled that the Elections Clause grants Congress the power to override state regulations by establishing uniform rules for federal elections, binding on the States… the regulations made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative

*Foster v. Love*, 522 U.S. 67, 69 (1997) (citations omitted); *see also Arizona*, 570 at 7-9 & n.1 (discussing the breadth of the Elections Clause).

Congress preempted Arizona's state laws and Defendant's arguments in the three statutes at issue in this litigation. Title III of the CRA imposes a "sweeping" obligation on election officials to preserve and, on request, to produce registration records pertaining to federal elections. *Lynd*, 306 F.2d at 226. HAVA requires states to implement a computerized VRDB and establish minimum standards for accurate VRDBs which includes use of a "system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters." 52 U.S.C. § 21083(a). Section 8(i) of the NVRA requires states to make available "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters…." 52 U.S.C. § 20507(i)(1). Thus, Title III, the NVRA, and HAVA preempt state laws interfering with the production of election records. [15]

**G. Federal Privacy Laws Do Not Prevent the United States from Procuring Election Records**

Defendant argues that various federal laws are a complete bar to the Government's ability to procure election records under Title III. Def.'s Mot., Doc. 25, at 5. None of the statutes he cited prevent the Government from securing Arizona's VRDB. Additionally, Arizona provides the full, unredacted data – the very data the United States seeks – to the Electronic Registration Information Center (ERIC), a private party for the purpose of list maintenance.[16] It strains credulity that Arizona can provide unredacted information to ERIC

---

[15] Congress enacted Title III because several states interfered with federal investigations into election practices and deleted records within 30 days of a voter's rejected registration. *See* Testimony of Deputy Attorney General Lawrence E. Walsh, *Hearings Before the Committee on the Judiciary, United States Senate on H.R. 8601, March 28 and 29, 1960*, 9-10.

[16] *See* ERIC, ERIC Overview, *available at* https://ericstates.org/ (last visited March 10, 2026).

but not to the United States to verify that the State is, in fact, complying with the NVRA and HAVA.

   1. *The United States is complying with the Privacy Act.*

The Defendant suggests that dismissal is appropriate because the allegations in the Complaint establish that DOJ has failed to comply with the Privacy Act. Def.'s Mot. at 12-15. Rather than acting as a proactive bar to obtaining the VRDBs, the Privacy Act and Section 304 of the CRA simply require that when protected information is obtained, it must be securely stored and not be subject to unauthorized dissemination or use.

The voter information that the United States is collecting is maintained according to the Privacy Act protections explained in the Department of Justice, Civil Rights Division's Privacy Policy, which it has published online. The full list of routine uses for this collection of information, which include investigations and enforcement actions, can be found in the Department of Justice's systems of records notices ("SORN"), most of which are identified with their citations in U.S. Dep't of Just., Privacy Act of 1974; System of Records, 82 Fed. Reg. 24147-01 (May 25, 2017), listed in a table at pages 24,148 to 24,151.

The statutes cited for routine use include the NVRA, HAVA, and the Civil Rights Act of 1960, as described in note 16 of the Department of Justice's Privacy Policy. The United States made its requests pursuant to those statutes. *See* Doc. 8-1, Doc. 8-3. The records in the system of records are kept under authority of 44 U.S.C. § 3101 and in the ordinary course of fulfilling the responsibility assigned to the Civil Rights Division under the provisions of 28 C.F.R. §§ 0.50, 0.51.

To the extent that Defendant is concerned about the transport of such data to the United States, the Department of Justice uses a secure file-sharing system, Justice Enterprise File Sharing ("JEFS"). That system implements strict access controls to ensure that each user can only access their own files and is also covered by SORNs.

The Privacy Act regulates federal agencies' collection, maintenance, and disclosure of information within their own systems of records—it does not restrict the ability of state actors to share information with federal agencies. The statute's plain language confirms that

it applies only to federal "agencies" as defined in 5 U.S.C. § 552a(a)(1). State and local entities fall outside that definition. There is no basis for the Defendant to fail or refuse to disclose information to a federal agency for law enforcement purposes, particularly here, where the United States is complying with the provisions of the Privacy Act.

> 2. *The E-Government Act does not prevent the United States from obtaining data supporting its HAVA and NVRA claims.*

The E-Government Act neither authorizes dismissal of this case nor limits the United States' ability to bring suit. *See* Def.'s Mot. at 15. The E-Government Act is not applicable to the United States' enforcement of HAVA and the NVRA. The United States is not initiating a new process whereby it is contacting individuals for information as contemplated by Pub. L. No. 107–347, § 208(b)(1)(A)(ii)(II). The request is made to the Defendant to provide a voter registration list already maintained pursuant to federal law to analyze Arizona's federally required list maintenance. The VRDB would be kept on a system for which a Privacy Impact Assessment has been done.[17] Only when a new system is established—not when each new data request is made—is a Privacy Impact Assessment required.[18]

Defendant misplaced his reliance on *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Elec. Integrity*, 266 F. Supp. 3d 297 (D.D.C. 2017). *See* Def.'s Mot. at 15. The U.S. Court of Appeals for the D.C. Circuit affirmed the district court's denial of a

---

[17] An Initial Privacy Assessment (IPA) Determination was issued on October 12, 2012, showing that no Privacy Impact Assessment is required for the Justice Consolidated Office Network (JCON) system where personal identifying information associated with the United States' CRA demand is stored. *See* 2d Neff Decl. ¶ 7.

[18] When the Civil Rights Division began using ServiceNow (SNOW), a FedRAMP High-compliant Software as a Service (SaaS) cloud-hosting provider offering a suite of natively integrated applications designed to support Information Technology Service Management (ITSM), resource management, and shared support services, it prepared a Privacy Act Assessment ("PIA") as required by the E-Government Act. *See* Office of Privacy & Civ. Liberties, DOJ Privacy Impact Assessments, *available at* https://www.justice.gov/opcl/doj-privacy-impact-assessments (last visited March 10, 2026).

preliminary injunction but did so on standing grounds, effectively vacating the district court's substantive analysis of the E-Government Act. *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Elec. Integrity*, 878 F.3d 371 (D.C. Cir. 2017).

### 3. The Driver's Privacy Protection Act does not allow Defendant to deny the United States list maintenance data.

Finally, Defendant incorrectly maintains that dismissal is warranted because the United States' demand violates the Driver's Privacy Protection Act ("DPPA"). Def.'s Mot. at 15-16. While the DPPA generally prohibits the disclosure of "personal information" obtained by a state Department of Motor Vehicles in connection with a motor vehicle record, it contains an exception permitting certain governmental uses. *See* 18 U.S.C. §§ 2721(a)-(b), 2725(1), (3), (4). Disclosure is allowed, for example, "for use by any government agency … in carrying out its functions," including law enforcement or other regulatory enforcement purposes. 18 U.S.C. §§ 2721(b)(1). This statutory language demonstrates that the DPPA was not intended to block all government access to DMV records.

The DPPA's prohibition is clearly not implicated in the present case. The Department of Justice is a government agency performing a statutorily mandated function—verifying voter registration records and associated list maintenance activities by state and local entities. Under the governmental-function exemption in § 2721(b)(1), the United States' use of DMV-provided information is permissible, even though the information originates from a motor vehicle record. Transfers of DMV data to government agencies for official functions, including voter registration administration, are therefore consistent with the DPPA and fall squarely within the statute's exceptions.

## V. CONCLUSION

For the foregoing reasons, the United States respectfully submits that the Motions to Dismiss by Secretary Fontes (Doc. 25), be denied and the United States' Motion to Compel Production of federal election records under Section 305 of the CRA (Doc. 7) be granted.

Respectfully submitted this 13th day of March, 2026

| | |
|---|---|
| TIMOTHY COURCHAINE<br>United States Attorney<br>District of Arizona | HARMEET K. DHILLON<br>Assistant Attorney General<br>Civil Rights Division |
| | ROBERT J. KEENAN<br>Acting Deputy Assistant Attorney General<br>Civil Rights Division |
| | ERIC V. NEFF<br>Acting Chief, Voting Section<br>Civil Rights Division |
| | */s/ Jonathon P. Hauenschild*<br>JONATHON P. HAUENSCHILD<br>Trial Attorney<br>Civil Rights Division \| Voting Section<br>United States Department of Justice<br>4 Constitution Square<br>150 M Street NE, Room 8.1134<br>Washington, D.C. 20002<br>Jonathon.Hauenschild@usdoj.gov<br>Tel. (202) 215-2110 |

18

## CERTIFICATE OF SERVICE

I hereby certify that on March 13, 2026, a true and correct copy of the foregoing document, the attached declaration, and all exhibits thereto were served via the Court's ECF system to all counsels of record.

*/s/ Jonathon P. Hauenschild*
Jonathon P. Hauenschild
Trial Attorney
Civil Rights Division | Voting Section
United States Department of Justice
4 Constitution Square
150 M Street NE, Room 8.1134
Washington, D.C. 20002
Jonathon.Hauenschild@usdoj.gov