Victoria Lopez (Bar No. 330042)
Lili Nimlo (Bar No. 038535)
ACLU Foundation of Arizona
2712 N. 7th Street
Phoenix, AZ 85014
(602) 650-1854
vlopez@acluaz.org
lnimlo@acluaz.org

Jonathan Topaz*
Theresa J. Lee*
Sophia Lin Lakin*
American Civil Liberties Union Foundation
125 Broad St., 18th Floor
New York, NY 10004
(212) 549-2500
jtopaz@aclu.org
tlee@aclu.org
slakin@aclu.org

Sarah Brannon*
Patricia Yan*
American Civil Liberties Union Foundation
915 15th St. NW
Washington, DC 20001
(202) 457-0800
sbrannon@aclu.org
pyan@aclu.org

*admitted pro hac vice

Attorneys for Proposed Amici Curiae
Common Cause, Shannon Roivas, Caleb D.
Trevino, and Kara Janssen

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| United States of America,<br><br>     *Plaintiff*,<br><br>v.<br><br>Adrian Fontes, in his official capacity as Secretary of State for the State of Arizona,<br><br>     *Defendant*. | No. 2:26-cv-00066-SMB<br><br>**BRIEF OF *AMICI CURIAE* COMMON CAUSE, SHANNON ROIVAS, CALEB D. TREVINO, AND KARA JANSSEN** |

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................... 1

INTEREST OF AMICI CURIAE ............................................................................. 2

BACKGROUND ..................................................................................................... 2

ARGUMENT........................................................................................................... 8

    I.    THE UNITED STATES' DEMANDS EXCEED THE STATUTORY
    AUTHORITY OF THE CRA AND ARE CONTRARY TO LAW. .............................. 8

        A.   The United States' Demand for Records Fails to Meet the Requisite Statutory
        Requirements of the CRA. ................................................................................. 9

        B.   Any Records Disclosed Under the CRA Should Be Redacted to Protect the
        Constitutional Rights of the Voter, so the Court must Deny the United States'
        Request. .............................................................................................................. 16

    II.   THE UNITED STATES DEMAND WOULD IMPERIL THE PRIVACY
    INTERESTS OF AND CHILL DEMOCRATIC PARTICIPATION BY ARIZONA
    VOTERS. ............................................................................................................. 19

CONCLUSION ..................................................................................................... 22

# TABLE OF AUTHORITIES

**Cases**

*Alabama ex rel. Gallion v. Rogers*,
187 F. Supp. 848 (M.D. Ala. 1960)........................................................................... 1

*American Federation of State, County. & Municipal Employees, AFL-CIO v.
Social Security Administration*,
No. 1:25-cv-596-ELH (D. Md. Jan. 16, 2026)........................................................ 7, 8

*Andrews v. D'Souza*,
696 F. Supp. 3d 1332 (N.D. Ga. 2023) ..................................................................... 20

*Carlborg v. Department of the Navy*,
No. 18-cv-1881, 2020 WL 4583270 (D.D.C. Aug. 10, 2020) .................................... 21

*Coleman v. Kennedy*,
313 F.2d 867 (5th Cir. 1963) ..................................................................................... 10

*Corner Post, Inc. v. Board of Governors of the Federal Reserve System*,
603 U.S. 799 (2024)................................................................................................... 13

*Crawford v. Marion County Election Board*,
553 U.S. 181 (2008)................................................................................................... 20

*Crystal v. United States*,
172 F.3d 1141 (9th Cir. 1999) ................................................................................... 11

*In re Coleman*,
208 F. Supp. 199 (S.D. Miss. 1962)......................................................................... 9, 18

*Kennedy v. Lynd*,
306 F.2d 222 (5th Cir. 1962)..................................................................................... 9, 19

*League of United Latin Am. Citizens – Richmond Region Council 4614 v. Public
Interest Legal Foundation*,
No. 1:18-cv-00423, 2018 WL 3848404 (E.D. Va. Aug. 13, 2018) ............................. 20

*Niz-Chavez v. Garland*,
593 U.S. 155 (2021)................................................................................................... 13

*Project Vote/Voting for America, Inc. v. Long*,
682 F.3d 331 (4th Cir. 2012)...................................................................................... 17

*Public Interest Legal Foundation v. Benson*,
　136 F.4th 613 (6th Cir. 2025) ................................................................................ 12

*Public Interest Legal Foundation v. Boockvar*,
　431 F. Supp. 3d 553 (M.D. Pa. 2019) .................................................................... 17

*Public Interest Legal Foundation, Inc. v. Bellows*,
　92 F.4th 36 (1st Cir. 2024) ............................................................................... 17, 18

*Public Interest Legal Foundation, Inc. v. Dahlstrom*,
　673 F. Supp. 3d 1004 (D. Alaska 2023) ................................................................ 17

*Public Interest Legal Foundation, Inc. v. Matthews*,
　589 F. Supp. 3d 932 (C.D. Ill. 2022) .................................................................... 17

*Public Interest Legal Foundation, Inc. v. North Carolina State Board of Elections*,
　996 F.3d 257 (4th Cir. 2021) ................................................................................. 17

*Sheetz v. County of El Dorado*
　601 U.S. 267 (2024) ............................................................................................... 19

*Tincher v. Noem*,
　No. 25-cv-04669 (D. Minn. Jan. 16, 2026) .............................................................. 8

*United States v. Hernandez*,
　322 F.3d 592 (9th Cir. 2003) ................................................................................. 16

*United States v. Oregon*,
　No. 6:25-cv-01666, 2026 WL 318402 (D. Or. Feb. 5, 2026) ...................... 10, 14, 15

*United States v. Weber*,
　No. 2:25-cv-09149, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026) ....................... passim

*Zadvydas v. Davis*,
　533 U.S. 678 (2001) ............................................................................................... 16

**Statutes**

5 U.S.C. § 552a ................................................................................................... 14, 21

52 U.S.C. § 20507 .................................................................................................. passim

52 U.S.C. § 20703 ............................................................................................... 1, 9, 16

iii

52 U.S.C. § 21083 ............................................................................................ 12

52 U.S.C. § 21085 ......................................................................................... 6, 14

52 U.S.C. § 21085 ............................................................................................ 12

Arizona Revised Statute § 16-168(F) ............................................................ 4, 17

Help America Vote Act (2002) ............................................................................ 4

National Voter Registration Act (1993) ............................................................... 4

Privacy Act of 1974 ............................................................................................ 4

**Other Authorities**

AAGDhillon, December 5, 2025,
  https://x.com/AAGDhillon/status/1997003629442519114 ........................... 6

Brief for the United States as Amicus Curiae, *Project Vote/Voting for Am., Inc. v.
  Long*, No. 11-1809 (4th Cir. Oct. 18, 2011) ................................................. 18

Brief for the United States as Amicus Curiae, *Pub. Int. Legal Found. v. Schmidt*,
  No. 23-1590 (3d Cir. Nov. 6, 2023) .............................................................. 18

Brief for the United States as Amicus Curiae, *Pub. Int. Legal Found., Inc. v.
  Bellows*, No. 23-1361 (1st Cir. July 25, 2024) ............................................. 18

Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y.
  TIMES MAG. (Nov. 16, 2025),
  https://www.nytimes.com/interactive/2025/11/16/magazine/trump-justice-
  department-staff-attorneys.html ...................................................................... 5

Jude Joffe-Block, *Trump's SAVE Tool Is Looking for Noncitizen Voters. But It's
  Flagging U.S. Citizens Too*, NPR, Dec. 10, 2025,
  https://www.npr.org/2025/12/10/nx-s1-5588384/savevoting-data-us-citizens. ............. 7

Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, *Tracker of Justice
  Department Requests for Voter Information*, Brennan Center for Justice
  (updated Feb. 27, 2026),
  https://perma.cc/8YMZ-AD97. ....................................................................... 3

Kyle Cheney, *Trump Administration Concedes DOGE Team May Have Misused
  Social Security Data*, POLITICO, Jan. 20, 2026,

https://www.politico.com/news/2026/01/20/trump-musk-doge-social-security-00737245 .................................................................................................................. 7

Miles Parks & Jude Joffe-Block, *Trump's DOJ focuses in on voter fraud, with a murky assist from DOGE*, NPR, May 22, 2025, https://www.npr.org/2025/05/17/nx-s1-5383277/trump-doj-doge-noncitizenvoting ...................................................................................................... 6

*Read Bondi's Letter to Minnesota's Governor*, N.Y. TIMES (Jan. 24, 2026), https://perma.cc/H5GY-ZKBS ...................................................................... 8, 15

Reid J. Epstein & Nick Corasniti, *Trump, in an Escalation, Calls for Republicans to "Nationalize" Elections*, N.Y. Times (Feb. 2, 2026), https://www.nytimes.com/2026/02/02/us/politics/trump-nationalize-elections.html ............................................................................................................ 5

U.S. Department of Justice, Civil Rights Division, *Federal Law Constraints on Post-Election "Audits"* (Jul. 28, 2021), https://perma.cc/74CP-58EH ......................... 1

## INTRODUCTION

In this action, the United States seeks to compel the disclosure of sensitive personal voter data to which it is not entitled, using the civil rights laws as a pretext. Because the United States failed to disclose the basis and purpose of its request for the data, dismissal should be granted, and its attempt to summarily dispose of this case via an improper motion to compel should be rejected.

Congress has repeatedly legislated to ensure that all eligible Americans can participate in free, fair, and secure elections. As the U.S. Department of Justice has explained, Title III of the Civil Rights Act of 1960 ("CRA"), the provision invoked here, was designed to "secure a more effective protection of the right to vote." U.S. Dep't of Just., C.R. Div., *Federal Law Constraints on Post-Election "Audits"* (Jul. 28, 2021), https://perma.cc/74CP-58EH (citing *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala. 1960); H.R. Rep. No. 86-956, at 7 (1959)).

The federal government's demand for Arizona's unredacted voter file—which contains sensitive personal information from every voter in the state—undermines the CRA's core purposes and is contrary to law. Releasing voter records without redaction and for purposes far afield from protecting voter access would deter voter participation and undermine the right to vote, especially given that the United States has fallen far short of fully and accurately setting forth "the basis and the purpose" for its data request, as required by the very statute that it invokes. 52 U.S.C. § 20703. The Court should dismiss.

1

## INTEREST OF AMICI CURIAE

*Amici Curiae* are Common Cause, a nonpartisan, good-government organization dedicated to grassroots voter engagement both nationally and specifically in Arizona; and Shannon Roivas, Caleb D. Trevino, and Kara Janssen, Arizona voters. Common Cause has an interest in protecting the voting and privacy rights of its members and all Arizona voters. It also has an organizational interest in encouraging Arizonans to register to vote and to participate in the political process. Ms. Roivas, Mr. Trevino, and Ms. Janssen have a strong interest in the security of their personal, private data.

All of these interests would be harmed by the relief the federal government seeks in this case. Disclosure of voters' personal information would invade the privacy of all of Common Cause's members who are registered Arizona voters, as well as Ms. Roivas, Mr. Trevino, and Ms. Janssen, and could potentially chill their political speech. The United States' requested relief would also pose a particular risk to certain groups of voters, such as naturalized citizens (including Mr. Trevino), voters with prior felony convictions (including Ms. Janssen), and people who have recently moved (including Ms. Roivas), all of whom are more likely to get caught up in improper voter purges. The requested relief would also harm Common Cause as an organization, due to its work related to voter registration and political participation. This work requires trust, and voter trust would be imperiled by the disclosure the United States seeks.

## BACKGROUND

Beginning in May 2025, Plaintiff United States, through its Department of Justice ("DOJ"), began sending letters to election officials across the country, with plans to gather

2

state voter registration files from all fifty states. *See* Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (updated Feb. 27, 2026), https://perma.cc/8YMZ-AD97.

On July 28, 2025, DOJ sent such a letter to Arizona Secretary of State Adrian Fontes ("the Secretary"), demanding, in part, "[t]he current electronic copy of Arizona's computerized statewide voter registration list" within 14 days of the date of the letter. Letter from Michael E. Gates to Adrian Fontes, Ex. 1, at 2 (July 28, 2025), Dkt. No. 8-1 ("July 28 Letter"); *see* Compl. ¶¶ 21–23, at 4; *id.* ¶ B, at 5. The Secretary's office responded on August 8, 2025, stating it was "currently reviewing records responsive to [DOJ's] request pursuant to Arizona's public records law … and determining whether any redactions may be required by state law." Compl. ¶ 24; Letter from Luke Douglas to Michael E. Gates and Maureen Riordan, Ex. 2, at 2 (Aug. 8, 2025), Dkt. No. 8-2 ("August 8 Letter").

DOJ responded on August 14, 2025, specifying that it was seeking, within seven days, a full and unredacted electronic copy of the statewide voter registration list that "contains *all fields*," including "full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number." *See* Compl. ¶¶ 25–28; Letter from Harmeet K. Dhillon to Adrian Fontes, Ex. 3, at 3–4 (Aug. 14, 2025), Dkt. No. 8-3 ("August 14 Letter"). DOJ stated that "[t]he purpose of the request is to ascertain Arizona's compliance with the list maintenance requirements of the [National Voter Registration Act of 1993 ("NVRA")] and [Help America Vote Act ("HAVA")]," but did not elaborate further or refer to any deficiencies with respect to Arizona's compliance with those statutes. August 14 Letter at 3.

Secretary Fontes responded on August 29. *See* Compl. ¶ 29; Letter from Adrian Fontes to Harmeet Dhillon, Michael E. Gates, and Maureen Riordan, Ex. 4 (Aug. 29, 2025), Dkt. No. 8-4 ("August 29 Letter"). Secretary Fontes noted that Arizona law prohibits the disclosure of much of the information DOJ was demanding in the unredacted voter file, including "month and day of birth date, the social security number or any portion thereof, the driver license number," and other personal information. *Id.* at 3 (quoting A.R.S. § 16-168(F)). Secretary Fontes also noted that neither of DOJ's letters "explain how [its] authority under the CRA applies to [its] stated purpose for demanding a copy of the voter registration database to ascertain Arizona's compliance with the list maintenance requirements of the NVRA and HAVA or preempts state privacy laws." *Id.* (internal quotation marks omitted). Secretary Fontes also noted that "the Privacy Act of 1974 imposes specific limitations upon Federal agencies, including [DOJ], when they collect … information concerning individual citizens," and warned that voters must be able to exercise their constitutional right to vote "without fear that the information they provide to do so could be disseminated in a way that fails to protect their privacy or is contrary to law." *Id.* Finally, Secretary Fontes pointed out that even if Arizona complied with DOJ's request, "that data alone does not provide evidence regarding Arizona's compliance with" the NVRA's list maintenance requirements, and instead "merely captures a snapshot in time and provides little information about list maintenance activities." *Id.* at 4.

The United States responded by filing this lawsuit, which is one of at least thirty that DOJ has recently initiated to compel states and election officials to disclose sensitive

4

voter data. A day later, the United States filed a motion to compel the production of the unredacted Arizona voter file. Mot. for Order to Compel Records, Dkt. No. 7, at 3.

DOJ's request for private, sensitive voter data appears to be in connection with never-before-seen efforts by the United States to construct a national voter database, and to otherwise use untested forms of database matching to scrutinize voter rolls—in short, as part of President Trump's self-described efforts to "nationalize" elections.[1] According to reporting, DOJ employees "have been clear that they are interested in a central, federal database of voter information." Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times, Sept. 9, 2025, https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html.     A lawyer who recently left DOJ's Civil Rights Division described to New York Times reporters the government's real aims behind the pretext in these lawsuits:

> We were tasked with obtaining states' voter rolls, by suing them if necessary. Leadership said they had a DOGE person who could go through all the data and compare it to the Department of Homeland Security data and Social Security data. . . . I had never before told an opposing party, Hey, I want this information and I'm saying I want it for this reason, but I actually know it's going to be used for these other reasons. That was dishonest. It felt like a perversion of the role of the Civil Rights Division.

Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. TIMES MAG., Nov. 16, 2025, https://www.nytimes.com/interactive/2025/11/16/magazine/trump-justice-department-staff-attorneys.html.

Notably, the United States' own representations to states tend to corroborate

---

[1] Reid J. Epstein & Nick Corasniti, *Trump, in an Escalation, Calls for Republicans to "Nationalize" Elections*, N.Y. Times (Feb. 2, 2026), https://www.nytimes.com/2026/02/02/us/politics/trump-nationalize-elections.html

suspicions of federal overreach that could disenfranchise voters. Far from indicating a purpose of ensuring compliance with the NVRA and HAVA, the United States' proposed MOU seeks to place authority to identify supposed ineligible voters in the hands of the federal government and requires removal of supposedly ineligible voters within 45 days— directly contrary to those statutes' text. *Compare* U.S. Dep't of Just., Civ. Div., Confidential Mem. of Understanding ("MOU"), Dkt. No. 14-6 at 2, 5, *with* 52 U.S.C. § 21085 (methods of complying with HAVA "left to the discretion of the State"), and, *e.g.*, 52 U.S.C. § 20507 (protecting voters from removal under certain circumstances).

Recent events have further highlighted the abnormal nature of the United States' request. Public reporting reveals that as another part of its efforts to use novel and unspecified forms of data analysis to scrutinize state voter data and target voters for potential disenfranchisement, DOJ last year asked staffers from the new "Department of Governmental Efficiency" ("DOGE") to identify noncitizens in state voter rolls by matching voter data with data from the Social Security Administration.[2] DOJ officials have since claimed that "[they]'ve checked 47.5 million voter records" and found "several thousand non-citizens who are enrolled to vote in Federal elections," although public reporting indicates that these efforts are producing false positives—*i.e.*, that they are flagging U.S. citizens as being non-citizens who are ineligible to vote.[3]

---

[2] *E.g.*, Miles Parks & Jude Joffe-Block, *Trump's DOJ focuses in on voter fraud, with a murky assist from DOGE*, NPR, May 22, 2025, https://www.npr.org/2025/05/17/nx-s1-5383277/trump-doj-doge-noncitizenvoting.

[3] December 5, 2025 Post by @AAGDhillon https://x.com/AAGDhillon/status/1997003629442519114; *see* Jude Joffe-Block, *Trump's SAVE Tool Is Looking for Noncitizen Voters. But It's Flagging U.S. Citizens Too*, NPR,

A recent filing by DOJ correcting misrepresentations in another federal court case further corroborates how United States officials have been seeking to use voter data in conjunction with DOGE-inspired data-matching and aggregation techniques, and have been working with outside groups seeking to deny election results in those efforts. As detailed in the corrected filing, which was made on behalf of the U.S. Social Security Administration ("SSA"):

> [I]n March 2025, a political advocacy group contacted two members of SSA's DOGE Team with a request to analyze state voter rolls that the advocacy group had acquired. The advocacy group's stated aim was to find evidence of voter fraud and to overturn election results in certain States. In connection with these communications, one of the DOGE team members signed a "Voter Data Agreement," in his capacity as an SSA employee, with the advocacy group. He sent the executed agreement to the advocacy group on March 24, 2025.

Notice of Corrections to the Record at 5, *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, No. 1:25-cv-596-ELH, Dkt. No. 197 (D. Md. Jan. 16, 2026); *see also* Kyle Cheney, *Trump Administration Concedes DOGE Team May Have Misused Social Security Data*, POLITICO, Jan. 20, 2026, https://www.politico.com/news/2026/01/20/trump-musk-doge-social-security-00737245. The filings, which do not specify the terms of the "Voter Data Agreement" or the activities these DOGE actors or others undertook pursuant to it, also indicated that, around the same period, DOGE actors also improperly shared unknown amounts of social security data on

---

Dec. 10, 2025, https://www.npr.org/2025/12/10/nx-s1-5588384/savevoting-data-us-citizens.

an unapproved third-party server, in a "manner [that] is outside SSA's security protocols."

Notice of Corrections to the Record, *supra*, at 6.

On January 24, 2026, Attorney General Pamela Bondi wrote a letter to Minnesota

Governor Tim Walz, purporting to discuss DHS's "Operation Metro Surge" activities in the

Twin Cities amidst ongoing violence against the civilian population there.[4] Like Arizona,

Minnesota has been sued by the federal government seeking access to its unredacted voter

rolls. The letter set out three actions the federal government wanted Minnesota to take to

"restore the rule of law, support ICE officers, and bring an end to the chaos in Minnesota,"

one of which was to "allow the Civil Rights Division of the Department of Justice to access

voter rolls."[5]

**ARGUMENT**

**I.   THE UNITED STATES' DEMANDS EXCEED THE STATUTORY AUTHORITY OF THE CRA AND ARE CONTRARY TO LAW.**

The United States' demand for Arizona's full and unredacted electronic voter file

exceeds its statutory authority under the CRA. Against the backdrop of the turmoil of the

Jim Crow era, Congress enacted the CRA, including the public records provisions in Title

III, to facilitate investigations of civil rights violations preventing eligible citizens from

voting due to discrimination. H.R. Rep. No. 86-956, at 7 (1959) (indicating the purpose of

Title III "is to provide a more effective protection of the right of all qualified citizens to

---

[4]      *Read Bondi's Letter to Minnesota's Governor*, N.Y. TIMES (Jan. 24, 2026), https://perma.cc/H5GY-ZKBS ("Bondi Letter"); *see also* Order, *Tincher v. Noem*, No. 25-cv-04669 (D. Minn. Jan. 16, 2026), Dkt. No. 85 (granting injunction against certain DHS practices in Minneapolis-St. Paul).
[5]      Bondi Letter at 2-3.

vote without discrimination on account of race"). But if the Attorney General makes a demand for records, she must provide "a statement of the basis and the purpose therefor." 52 U.S.C. § 20703.

The Complaint fails to adequately plead a claim for relief under the CRA for at least two distinct reasons. *First*, the United States fails to plausibly allege that it has offered a statutorily sufficient statement of "the basis and the purpose" of its sweeping demand for Arizona's full and unredacted state voter registration list, giving insufficient and pretextual explanations. *Second*, the United States does not make any showing that turning over *unredacted* records, replete with private voter information, is required under the CRA. Instead, producing this data would run directly contrary to the CRA, which exists to protect the right to vote.

### A.      The United States' Demand for Records Fails to Meet the Requisite Statutory Requirements of the CRA.

Title III of the CRA requires election officials to retain certain federal election records for 22 months, 52 U.S.C. § 20701, and authorizes the Attorney General, upon a written request that "contain[s] a statement of the basis *and* the purpose therefor" to inspect, reproduce, and copy those records, *id.* § 20703 (emphasis added).

The federal government's requests to Arizona fail to provide "a statement of the basis and the purpose" sufficient to support disclosure of the unredacted voter file. *Id*. Contemporaneous case law immediately following the enactment of Title III of the CRA shows that the "basis" and "purpose" were distinct concepts. *Kennedy v. Lynd*, 306 F.2d 222, 229 n.6 (5th Cir. 1962); *In re Coleman*, 208 F. Supp. 199, 199–200 (S.D. Miss. 1962),

*aff'd sub nom.*, *Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963). The "basis" is the Attorney General's stated reason for believing there is a violation of federal civil rights law. *See Lynd*, 306 F.2d at 229 n.6; *United States v. Oregon*, No. 6:25-cv-01666, 2026 WL 318402, at *9 (D. Or. Feb. 5, 2026) (holding the basis prong requires "a factual basis for investigating a violation of a federal statute"); *United States v. Weber*, No. 2:25-cv-09149, 2026 WL 118807, at *9 (C.D. Cal. Jan. 15, 2026) ("The basis is the reasoning provided by the DOJ regarding the evidence behind its investigation of a particular state and specific, articulable facts pointing to the violation of federal law."). The "purpose" explains how the requested records would help determine if there is a violation of the law. *See Lynd*, 306 F.2d at 229 n.6; *Oregon*, 2026 WL 318402, at *10 ("[T]he 'purpose' required in a demand for records under Title III must relate to a purpose of investigating violations of individuals' voting rights.").

The basis-and-purpose requirement under the CRA is a "critical safeguard that ensures the request is legitimately related to the purpose of the statute." *Weber*, 2026 WL 118807, at *9. It prevents the statute from being used for a "fishing expedition" to obtain records for reasons that are speculative, unrelated to the CRA's aims, or otherwise impermissible or contrary to law. *Id.* The statutory basis-and-purpose requirement therefore is not perfunctory but requires a specific statement as to the reason for requesting the information and how that information will aid in the investigatory analysis. *See Oregon*, 2026 WL 318402, at *9 ("If *any* purpose—regardless of its relationship to the purposes of the statute itself—would suffice, then the requirement of stating the demand's purpose would serve no function.").

10

For example, in addressing an analogous power by which the IRS obtains records for investigations via administrative subpoenas, courts have found that the test of judicial enforcement of such subpoenas includes an evaluation of whether the investigation is "conducted for a legitimate purpose," *Crystal v. United States*, 172 F.3d 1141, 1143 (9th Cir. 1999) (citing *United States v. Powell*, 379 U.S. 48, 57-58 (1964)), and that the administrative subpoena should not be "overbroad" such that it "amount[s] to a fishing expedition," *E.E.O.C v. Evening Ent. Grp. LLC*, No. CV 11–01870–PHX–FJM, 2012 WL 2357261, at *1 (D. Ariz. June 20, 2012.

As set forth below, the United States failed to articulate in its demand and in the Complaint "the basis and purpose" for its request for Arizona voters' sensitive personal information. DOJ's correspondence states that the "purpose" of its request for Arizona's complete and current voter registration list was to "ascertain Arizona's compliance with the list maintenance requirements of the NVRA and HAVA." August 14 Letter at 3. But neither DOJ's complaint nor its letter invoking the CRA supplies a "basis" for why the United States believes Arizona's list maintenance procedures might violate the NVRA, HAVA, or the CRA in the first place. Nor does the Complaint (or DOJ's two letters) allege anomalies or anything inconsistent with reasonable list maintenance efforts in the data Arizona has reported to the U.S. Election Assistance Commission. *See* Compl. ¶¶ 19–30; July 28 Letter; August 14 Letter; *see also* August 29 Letter (Secretary Fontes noting that DOJ did "not explain how [its] authority under the CRA applies to [its] stated purpose for demanding a copy of the voter registration database 'to ascertain Arizona's compliance

11

with the list maintenance requirements of the NVRA and HAVA….'" (quoting August 14

Letter at 3)).

Even if the United States had provided a proper "basis" for its demand—it does

not—it fails to explain any connection between its purported "purpose" and the vast scope

of its records request here. For example, it does not attempt to explain why the full and

unredacted Arizona statewide voter file is necessary to determine whether Arizona has

"conduct[ed] a general program that makes a reasonable effort to remove the names of

ineligible voters" by virtue of "death" or "a change in the residence of the registrant." 52

U.S.C. § 20507(a)(4); Compl. ¶ 12. Such records are not necessary: A single snapshot of a

state's voter list does not and could not provide the information needed to determine if the

state has made a "reasonable effort" to remove ineligible voters under Section 8 of the

NVRA. Compl. ¶ 12; 52 U.S.C. § 20507(a)(4)(A)–(B); *see also* August 29 Letter at 4

(Secretary Fontes explaining that "[t]he voter registration list merely captures a snapshot

in time and provides little information about list maintenance activities."). The NVRA and

HAVA both leave the mechanisms for conducting list maintenance within the discretion of

the State. *See* 52 U.S.C. §§ 20507(a)(4) & (c)(1), 21083(a)(2)(A), 21085. The *procedures*

carried out by a state or locality establish its compliance; the unredacted voter file does not.

Even if the United States were to use voter file data to identify voters who had moved or

died on Arizona's voter list at a single point in time, that would not amount to Arizona

failing to comply with the "reasonable effort" required by the NVRA or HAVA. *See, e.g.,*

*Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 624–27 (6th Cir. 2025) (describing a

"reasonable effort" as "a serious attempt that is rational and sensible" and rejecting any

"quantifiable, objective standard" in this context), *petition for cert. filed* (U.S. Oct. 7, 2025) (No. 25-437)).

Moreover, even if some portion of the voter file were necessary to investigate "Arizona's compliance with federal election law," Compl. ¶ 21, the United States has not provided any justification for why the full unredacted voter file is necessary to carry out this purported purpose. In over three decades since the NVRA's enactment, DOJ has never before sought nor required a full and unredacted voter file in its investigations regarding NVRA compliance. The United States' failure to articulate the basis and the purpose for demanding the full and unredacted voter file makes its demand insufficient as a matter of law.

Not only is the government's statement insufficient as a matter of law; it is also pretextual. Section 303 of the CRA requires a statement of "*the* basis and *the* purpose" of a records request, and by twice using the definite article, the statute requires not just *a* basis or purpose among many, but *the* complete basis and purpose underlying the request. *See Niz-Chavez v. Garland*, 593 U.S. 155, 165-66 (2021); *see also, e.g.*, *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 817 (2024) (emphasizing distinction between the definite and the indefinite article). But the United States has not disclosed the actual purpose for its requests, and this Court "is not obliged to accept a contrived statement and purpose" in place of an accurate one. *Weber*, 2026 WL 118807, at *10.

Public reporting and public, judicially-noticeable documents confirm that the United States' *actual* purpose is not to ensure compliance with the NVRA and HAVA, but to build an unprecedented national voter file through novel, error-prone, forms of data-

13

matching, and then to use this tool to identify ostensibly ineligible voters and challenge their right to vote. *See supra* 6–8 & nn.3–5. As *Weber* concluded after assessing the same robust set of public reporting and documents: "It appears that the DOJ is on a nationwide quest to gather the sensitive, private information of millions of Americans for use in a centralized federal database." 2026 WL 118807, at *10; *accord Oregon*, 2026 WL 318402, at *11, *13.

Such a database would be unlawful in multiple ways. The creation of any national voter database—much less one designed for targeting and mass-challenging voters—has never been authorized by Congress, and would violate (among other provisions of federal law) the federal Privacy Act's prohibition on the creation or maintenance of any database "describing how any individual exercises rights guaranteed by the First Amendment," which necessarily includes exercising the right to vote. *See* 5 U.S.C. § 552a(e)(7).

Consider also the MOU that the United States has recently pushed a number of states to sign in connection with its requests for statewide voter files. *See supra* 5 & n.1. The NVRA and HAVA require a state to conduct a "reasonable effort" to remove ineligible voters from the rolls, 52 U.S.C. §§ 20507(a)(4), 21083(a)(4)(A), and the NVRA includes safeguards to protect voters from erroneous removal. The government's proposed MOU indicates multiple contemplated violations of those statutory requirements. First, it seeks to place authority to identify supposed ineligible voters in the hands of the federal government, contrary to statutory text, 52 U.S.C. § 21085 (leaving methods of complying with HAVA "to the discretion of the State"). MOU at 2, 5. Second, the MOU's substantive terms seek to compel states to remove supposedly ineligible voters "within forty-five (45)

14

days," *id.* at 5, in a way that would violate multiple protections of the NVRA, 52 U.S.C. § 20507.

Finally, there is the Attorney General's recent letter to Minnesota Governor Tim Walz, demanding that Minnesota turn over voters' private data in order to help "support ICE officers" and "bring an end to the chaos" being inflicted by DHS agents ostensibly enforcing immigration law. *See* Bondi Letter at 2-3. Attorney General Bondi's letter, which by its terms connects DOJ's request for state voter data with the Administration's draconian immigration-enforcement efforts, highlights DOJ's failure to disclose the true purpose of its request. *See Oregon*, 2026 WL 318402, at *11 ("The context of this demand within a letter about immigration enforcement casts serious doubt as to the true purposes for which Plaintiff is seeking voter registration lists in this and other cases, and what it intends to do with that data.").

The United States' failure to honestly disclose what it is doing and will do with voters' sensitive personal information—to state *the* true purpose behind its demand for Arizonans' protected personal data—is independently fatal to the CRA claim. "Congress passed the NVRA, Civil Rights Act, and HAVA to protect voting rights. If the DOJ wants to instead use these statutes for more than their stated purpose, circumventing the authority granted to them by Congress, it cannot do so under the guise of a pretextual investigative purpose." *Weber*, 2026 WL 118807, at *12; *accord Oregon*, 2026 WL 318402, at *11 ("The presumption of regularity that has been previously extended to [the United States] that it could be taken at its word—with little doubt about its intentions and stated purposes—no longer holds.").

15

**B.    Any Records Disclosed Under the CRA Should Be Redacted to Protect the Constitutional Rights of the Voter, so the Court must Deny the United States' Request.**

Even if disclosure were appropriate, sensitive personal voter information would still be subject to redaction, which is not barred under Title III. Courts have found that redaction may be required to prevent the disclosure of sensitive personal information that would create an intolerable burden on the constitutional right to vote. The cases interpreting Section 8(i) of the NVRA are instructive, as courts have consistently permitted—and have sometimes required—redaction of voters' sensitive personal data before disclosure to protect voter privacy and ensure compliance with federal and state law.

Like the CRA, the NVRA is silent as to how sensitive personal information should be treated during disclosure. *See* 52 U.S.C. §§ 20703, 20507(i)(1). Courts must interpret the disclosure provisions in these statutes in a manner that does not unconstitutionally burden the right to vote. *See United States v. Hernandez*, 322 F.3d 592, 594–95 (9th Cir. 2003) (noting "the fundamental principle of judicial restraint that ordinarily requires courts to construe statutes, if it is fairly possible to do so, in a way that avoids unnecessarily addressing constitutional questions") (citing *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001)).

Federal courts throughout the country have consistently struck this balance, interpreting the "all records concerning" language in Section 8(i) to permit—and sometimes require—redaction and the protection of confidential materials. As the First Circuit has noted, "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in the Voter File," and such redaction "can further assuage the potential privacy risks implicated by the public release of the Voter

16

File." *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024); *see also Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 266–68 (4th Cir. 2021) (holding that potential connection to ongoing criminal investigations and possibility of erroneously labeling a voter as a noncitizen and subjecting them to public harassment warrants maintaining confidentiality of records). Other courts have consistently recognized that the NVRA does not compel the release of sensitive information that is otherwise protected by federal or state laws.[6] And Arizona law in fact expressly protects from public disclosure much of the information that would be included in the unredacted voter file that DOJ demands. *See* A.R.S. § 16-168 (F) (protecting from disclosure, among other things, the "month and day of birth date, the social security number or any portion thereof, the driver license number," and other personal information of Arizona voters).

Redaction may also be affirmatively required if the disclosure would "create[] an intolerable burden on [the constitutional right to vote] as protected by the First and Fourteenth Amendments." *Project Vote/Voting for America, Inc. v. Long*, 682 F.3d 331, 339 (4th Cir. 2012) (internal quotation marks and citation omitted). The Fourth Circuit, even while granting access to voter registration applications, affirmed the importance of redacting Social Security numbers, which are "uniquely sensitive and vulnerable to abuse."[7] *Id.* The court emphasized that the NVRA reflected Congress's view that the right

---

[6] *See, e.g.*, *N.C. State Bd. of Elections*, 996 F.3d at 264; *Pub. Int. Legal Found., Inc. v. Dahlstrom*, 673 F. Supp. 3d 1004, 1015–16 (D. Alaska 2023); *Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp. 3d 932, 942 (C.D. Ill. 2022), *clarified on denial of reconsideration*, 2022 WL 1174099 (C.D. Ill. Apr. 20, 2022); *Pub. Int. Legal Found. v. Boockvar*, 431 F. Supp. 3d 553, 561–63 (M.D. Pa. 2019).

[7] The United States itself has explained—on multiple occasions—that the NVRA does not

17

to vote was "fundamental," and that the unredacted release of records risked deterring citizens from registering to vote and thus created an "intolerable burden" on this fundamental right. *Id.* at 334, 339; *cf. In re Coleman*, 208 F. Supp. 199, 200 (S.D. Miss. 1962) (noting, in the context of a Title III records request, multiple considerations which could be "[s]ignificant," including that "[i]t is not claimed that these official records are privileged, or exempt from discovery for any sound reason of public policy," or "that an inspection of these records would be oppressive, or any unlawful invasion of any personal constitutional right"). As such, public disclosure provisions such as those in the NVRA and Title III of the CRA must be interpreted to avoid this unconstitutional burden. *See Long*, 682 F.3d at 339; *Bellows*, 92 F.4th at 56. The danger of imposing those burdens on Arizona voters and civic organizations is present here. *See* Decl. of Shannon Roivas, Ex. 3 to Mot. to Intervene, ¶¶ 5, 9, Dkt. No. 14-3; Decl. of Caleb D. Trevino, Ex. 4 to Mot. to Intervene, ¶¶ 2, 4, 8–10, Dkt. No. 14-4; Decl. of Kara Janssen, Ex. 5 to Mot. to Intervene, ¶¶ 3–4, 6–7, Dkt. No. 14-5; Decl. of Arizona Program Director for Common Cause Jennifer Guzman Galvan, Ex. 2 to Mot. to Intervene, ¶¶ 5–6, 11–15, Dkt. No. 14-2.

The same privacy and constitutional concerns warranting redactions under the NVRA apply equally to requests under the CRA. No matter the statutory mechanism,

---

prohibit the States from redacting "uniquely sensitive information" when disclosing voting records. *See, e.g.*, Br. for the United States as Amicus Curiae, *Pub. Int. Legal Found., Inc. v. Bellows*, No. 23-1361 (1st Cir. July 25, 2024), 2023 WL 4882397 at *27–28; Br. for the United States as Amicus Curiae, *Pub. Int. Legal Found. v. Schmidt*, No. 23-1590 (3d Cir. Nov. 6, 2023), https://perma.cc/3BQ9-36UJ ("States may redact certain information before disclosing Section 8(i) records."); Br. for the United States as Amicus Curiae, *Project Vote/Voting for Am., Inc. v. Long*, No. 11-1809 (4th Cir. Oct. 18, 2011), 2011 WL 4947283, at *11, 25–26.

conditioning the right to vote on the release of voters' sensitive private information "creates an intolerable burden on that right." *Long*, 682 F.3d at 339 (citation omitted); *cf. Sheetz v. Cnty. of El Dorado*, 601 U.S. 267, 281–82 (2024) (Gorsuch, J., concurring) ("[O]ur Constitution deals in substance, not form. However the government chooses to act, . . . it must follow the same constitutional rules."). And the limited case law considering CRA records requests acknowledges that courts retain the "power and duty to issue protective orders," *Lynd*, 306 F.2d at 230, such as the redaction of sensitive fields that courts have consistently determined are entitled to protection from disclosure.

## II.    THE UNITED STATES DEMAND WOULD IMPERIL THE PRIVACY INTERESTS OF AND CHILL DEMOCRATIC PARTICIPATION BY ARIZONA VOTERS.

Even if the DOJ satisfied statutory requirements—which it does not—granting its request would still thwart the purposes of the CRA by chilling the voting rights of Arizonans. Here, the United States seeks highly sensitive personal information, including full birth dates and driver's license numbers or partial Social Security numbers for every registered voter in the state. Disclosing this type of personal information to the federal government would sow seeds of doubt into the minds of voters and discourage democratic participation.

Allowing the DOJ access to voter information under the guise of election-fraud prevention would harm voters' interests and erode democracy. The federal government would be emboldened to endlessly challenge and undermine elections, leading voters to become disillusioned with the electoral process. *See Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 197 (2008) (plurality op.) (recognizing that "public confidence in the

19

integrity of the electoral process . . . encourages citizen participation in the democratic process"). Some voters could be discouraged from registering to vote and voting out of fear that they will be subjected to baseless voter challenges or even improper prosecution. *See Weber*, 2026 WL 118807, at *20 ("The centralization of [confidential voter] information by the federal government would have a chilling effect on voter registration . . . lead[ing] to decreasing voter turnout as voters fear that their information is being used for some inappropriate or unlawful purpose."). Others could fear being subjected to public harassment by elected officials and the media making baseless claims of fraud. *See, e.g.*, *Andrews v. D'Souza*, 696 F. Supp. 3d 1332, 1348-49 (N.D. Ga. 2023) (holding that publication of a citizen's face and license plate in video falsely alleging he was engaged in election fraud constituted voter intimidation under the CRA); *League of United Latin Am. Citizens – Richmond Region Council 4614 v. Pub. Int. Legal Found.*, No. 1:18-cv-00423, 2018 WL 3848404, at *4 (E.D. Va. Aug. 13, 2018) (similar, for allegations of voter fraud accompanied by individual voters' personal information obtained from county registrars).

Certain voters—especially those from historically marginalized communities—may fear that disclosure of their personal information could lead to them being swept up in fishing expeditions unrelated to voting. For example, naturalized citizens or individuals who had their rights restored after a conviction may fear being subjected to challenges based on erroneous and outdated data. *See Weber*, 2026 WL 118807, at *2 ("The DOJ's request . . . stands to have a chilling effect on . . . political minority groups and working-class immigrants who may consider not registering to vote or skip casting a ballot because they are worried about how their information will be used.").

20

Voters must be assured that they will not be penalized for exercising their right to vote and that when they cast a ballot, their most sensitive information is protected from disclosure. Federal laws like the Privacy Act restrict access to any record that "contains [one's] name, or the identifying number, symbol, or other identifying particular assigned to [an] individual." *See* 5 U.S.C. § 552a(a)(4). Yet the federal government threatens voter privacy and trust by bypassing the appropriate procedures to pursue the State's unredacted voter registration list, which contains protected identifying information under the law. *See Carlborg v. Dep't of the Navy*, No. 18-cv-1881, 2020 WL 4583270, at *7 (D.D.C. Aug. 10, 2020) (concluding that the Navy "properly withheld personal identifying information [including names, *signatures*, and social security numbers] pertaining to third parties who had not provided their consent to disclose that information" to the requester). Furthermore, the federal government seemingly seeks this protected information to create a "centralized federal database" comprised of the "sensitive [and] private information of millions of Americans," *Weber*, 2026 WL 118807, at *10, which would also be unlawful under the Privacy Act. *See* 5 U.S.C. § 552a(e)(7) (prohibiting the creation or maintenance of any database "describing how any individual exercises rights guaranteed by the First Amendment," which necessarily includes exercising the right to vote). Altogether, the federal government's quest threatens the bedrock privacy protections upon which voters rely and to which they have a legal right. *Weber*, 2026 WL 118807, at *18.

These fishing expeditions would likely lead to the wrongful purging of eligible voters across Arizona. As explained above, the United States' proposed MOU seeks to place authority to identify supposed ineligible voters in the hands of the federal

21

government, and requires removal of supposedly ineligible voters within 45 days—directly contrary to federal law.

Exposing sensitive voter information opens the door to voter intimidation and fear, "threaten[ing] the right to vote which is the cornerstone of American democracy." *Weber*, 2026 WL 118807, at *20. To protect this fundamental right, the federal government must not be granted unlawful access to Arizona voters' sensitive and personal information.

## CONCLUSION

The United States' motion to compel should be denied and the complaint dismissed.

Dated: April 8, 2026

Jonathan Topaz*
Theresa J. Lee*
Sophia Lin Lakin*
American Civil Liberties Union Foundation
125 Broad St., 18th Floor
New York, NY 10004
(212) 549-2500
jtopaz@aclu.org
tlee@aclu.org
slakin@aclu.org

Sarah Brannon*
Patricia Yan*
American Civil Liberties Union Foundation
915 15th St. NW
Washington, DC 20001
(740) 632-0671
sbrannon@aclu.org
pyan@aclu.org

*admitted pro hac vice*
*Attorneys for Proposed Amici Curiae*
*Common Cause, Shannon Roivas, Caleb D.*
*Trevino, and Kara Janssen*

Respectfully submitted,

*/s/ Lili Nimlo*
Lili Nimlo
Victoria Lopez
ACLU Foundation of Arizona
2712 N. 7th Street
Phoenix, AZ 85014
(602) 650-1854
lnimlo@acluaz.org
vlopez@acluaz.org

22