David B. Rosenbaum
Joshua J. Messer
OSBORN MALEDON, P.A.
2929 North Central Avenue, Suite 2000
Phoenix, Arizona 85012
Tel: (602) 640-9000
drosenbaum@omlaw.com
jmesser@omlaw.com

Norman Eisen+
Tianna Mays*
Pooja Chaudhuri*
Lindsay Zimliki*
Sofia Fernandez Gold*
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE, Ste.15180
Washington, D.C. 20003.
Tel: (202) 594-9958
norman@democracydefenders.org
tianna@democracydefenders.org
pooja@democracydefenders.org
lindsay@democracydefenders.org
sofia@democracydefenders.org

*Attorneys for Amicus Curiae,
the League of United Latin American
Citizens*

Timothy J. Ford*
Margaret Spitzer*
DILWORTH PAXSON LLP
1650 Market Street, Suite 1200
Philadelphia, PA 19103
Tel.: (215) 575-7000
tford@dilworthlaw.com
mpersico@dilworthlaw.com

*Application for admission pro hac vice
forthcoming*
+ *Admitted pro hac vice*

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| United States of America, | No. 2:26-cv-00066-SMB |
|---|---|
| *Plaintiff,* | |
| vs. | **UNOPPOSED BRIEF OF AMICUS CURIAE THE LEAGUE OF UNITED LATIN AMERICAN CITIZENS ("LULAC") IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS** |
| Arian Fontes, in his official capacity as Secretary of State for the State of Arizona, | |
| *Defendant.* | |

**INTRODUCTION**

Since May 2025, the United States Department of Justice ("DOJ") initiated legal suit against twenty-nine states and the District of Columbia seeking expansive, unredacted voter records containing sensitive, personally identifiable information for millions of registered voters. This action against the Arizona Secretary of State is the twenty-second such lawsuit filed by DOJ.

The basis of this lawsuit is Title III of the Civil Rights Act, 52 U.S.C.A. § 20703, which DOJ alleges authorizes the Attorney General to demand "all fields" within Arizona's statewide voter registration list. Yet, the statute upon which DOJ relies to justify its demand for "all fields" on each state's voter registration list requires the Attorney General to provide a basis and purpose for the demand. DOJ has failed to meet this requirement.

While DOJ's asserted purpose for its demand is to investigate voter registration "list maintenance," the true purpose, as two federal district courts have observed, is more likely connected to immigration enforcement. Reports indicate that the Department of Homeland Security's ("DHS") sub-agency, U.S. Citizenship and Immigration Services ("USCIS"), has already begun incorporating into its Systematic Alien Verification for Entitlements ("SAVE") Program data from state voter registration records supplied by states that ceded to DOJ's demands. DOJ's stated purpose for demanding the data is thus pretextual. DOJ is not investigating voter registration "list maintenance." It is hoarding voters' private data for its own unfettered use. Title III does not authorize the Attorney General to demand voter records for such a purpose.

The League of United Latin American Citizens ("LULAC") files this amicus brief in support of Defendant Secretary Fontes's motion to dismiss because, as several other federal district courts have now concluded, Title III does not justify DOJ's sweeping demand for Arizona's unredacted voter file. This brief highlights that DOJ's actions not only contort Title III beyond its proper purpose but also have a profound chilling effect on LULAC's members and the communities it serves. In the Latino communities in which LULAC works, heightened immigration enforcement has generated widespread fear that

personal information shared with government agencies will be used to target alleged noncitizens.

In this environment, DOJ's actions have had and will continue to have a chilling effect on Latino citizens' willingness to exercise their constitutional right to participate in the election process. And in this way, DOJ's actions also serve to frustrate LULAC's mission as a trusted voter registration organization in the community to register Latino citizens to vote. LULAC therefore submits this amicus brief to protect its members' rights to participate in elections without fear of reprisal from the federal government and to protect LULAC's mission to facilitate Latino citizens' continued ability to exercise their right to vote. LULAC respectfully requests that this Court deny DOJ's Motion for Order to Compel and grant Secretary Fontes's Motion to Dismiss.

## STATEMENT OF INTEREST

LULAC is the largest and oldest Latino civil rights organization in the United States with more than 420 councils nationwide and over 575,000 members. *See* Declaration of Juan Proaño ¶ 2, attached as Exhibit A to the Motion for Leave to File Amicus Brief. Founded in 1929, LULAC's mission is to improve the lives of Latino families throughout the United States and to protect their civil rights, including their voting rights. *Id.* ¶¶ 2–3.

The Arizona State Council of LULAC ("Arizona LULAC") has more than 4,000 members across more than 40 local councils in the state. *Id.* ¶ 11. Helping voters register to vote is a core activity of Arizona LULAC. *Id.* ¶ 19. Arizona LULAC helps register its Latino members and constituents at supermarkets, parks, and other public places in the barrios, as well as at naturalization ceremonies, churches, college campuses, and Hispanic heritage events such as Cinco de Mayo and Day of the Dead. *Id.* ¶ 13.

During these events, Arizona LULAC volunteers hand out voter registration forms, talk to prospective registrants about voting, and encourage them to register to vote. *Id.* ¶ 14. Arizona LULAC often partners with other community organizations, such as Mi Familia Vota, to run voter registration events as well as Univision—the largest Spanish-language

3

network in the United States—to help register U.S. citizens who are members of the Latino community. *Id.* ¶ 16–17.

Because Arizona requires additional information from prospective registrants to vote in state elections, Arizona LULAC volunteers generally use the state voter registration form so that registrants can vote in both state and federal elections. *Id.* ¶ 15. Volunteers also distribute the federal voter registration form, which in Arizona registers voters only for federal elections. *Id.*

When Arizona LULAC volunteers to help members register to vote using the state voter registration form, they walk voters through the various fields in the state form, e.g., Tribal ID number; Alien registration, naturalization, or citizenship certificate numbers; country of birth; occupation; father's name or mother's maiden name; email address; and signature of the registrant. *Id.* ¶ 14. These applications and the information they contain, become a part of the statewide voter registration file. *Id.* ¶¶ 22, 28.

Arizona LULAC has a strong interest in appearing as amicus in this case. DOJ's demand for the unredacted voter file, including personal and sensitive voter information has already had a chilling effect on Arizona LULAC's members. *Id.* ¶ 24. Since DOJ filed its lawsuit, the organization has witnessed a steady decline in the number of voter registrations from eligible voters in the Latino community. *Id.* ¶ 34. At events, Arizona LULAC volunteers have observed that potential voters are reluctant to engage with volunteers when they learn that the conversation is about voting. *Id.* As a result, they have been declining to interact with volunteers or to share information needed for volunteers to assist them in completing voter registration forms. *Id.* This has frustrated Arizona LULAC's mission, which is to help register as many eligible Arizonans as possible, particularly those in the Latino community, and encourage them to vote. *Id.* ¶ 36–37.

DOJ's lawsuit also jeopardizes the credibility of Arizona LULAC as an organization. *Id.* ¶ 30. For decades, LULAC has been viewed as a trusted and reliable organization in the community. *Id.* ¶¶ 28, 30. In the past, LULAC was able to reassure prospective registrants that their information was safe and secure. *Id.* ¶ 29. Relying on these

assurances, members of the community registered to vote with LULAC volunteers. *Id.* ¶¶ 28–29. Now, individuals whom the organization previously assisted have returned to express concern that LULAC misled them when it explained that their information would remain confidential. *Id.* ¶ 30.

**ARGUMENT**

**I.  DOJ's blanket demand for sensitive voter data has a chilling effect on LULAC's primarily Latino membership and constituency.**

The Supreme Court has long recognized that "the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights." *Reynolds v. Sims*, 377 U.S. 533, 562 (1964). That right is "preservative of all rights" because it is the cornerstone of our democracy. *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886); *see No Labels Party of Ariz. v. Fontes*, 142 F.4th 1226, 1231 (9th Cir. 2025) ("Voting is, without a doubt, of the most fundamental significance under our constitutional structure.") (internal quotation omitted).

DOJ's demand for Arizona's unredacted statewide voter registration list threatens to undermine that foundational right for LULAC's Latino voters. DOJ seeks an order to compel the state to turn over "the current electronic copy of Arizona's computerized statewide voter registration list, with *all fields*, including each registrant's full name, date of birth, residential address, and either their state driver's license number, the last four digits of their Social Security number, or HAVA unique identifier" within 5 days of a Court order. Compl. Prayer for Relief (B), (Doc. 1) (italics in original); Mot. to Compel, Prayer for Relief B, (Doc. 7). This sweeping demand for "all fields" has the potential to encompass a wide array of confidential information and, by its breadth, deter participation among LULAC's members and constituents. Ex. A, Proaño Decl. ¶ 24.

The chilling effect stems not only from the request for especially sensitive data such as social security numbers, birthdates, and driver's license numbers, but also from DOJ's insistence on "all fields," which raises a serious risk that additional confidential information collected by Arizona will be swept in. *Id.* The Arizona state voter registration

form collects a registrant's country of birth, alien registration number, naturalization certificate or citizenship certificate number, and father's name or mother's maiden name. *Id.* ¶ 22. While Arizona law expressly protects many of these fields from public inspection or disclosure, *see* A.R.S. § 16-168(C), (F), county recorders still maintain the information subject to state confidentiality provisions. As the Secretary notes in his motion to compel, the Arizona's Voter Registration Database "includes names and mailing addresses *and consists largely of voters' answers to standardized questions on the voter registration application.*" Resp. to Mot. to Compel 16, (Doc. 26) (italics added). Therefore, confidential information beyond social security numbers and driver's license numbers may also be included in an unredacted version of the state voter file.

The chilling effect created by DOJ's request for this broad swath of data is especially acute on LULAC's naturalized citizen members. A large percentage of LULAC's prospective eligible voters are naturalized citizens who are particularly concerned that federal acquisition of Arizona's unredacted voter registration list would lead to them being misidentified as "illegal voters" *Id.* ¶ 25. This is because naturalized citizens typically have both alien registration numbers, assigned to them by DHS, from before they become citizens and naturalization certificate numbers, which they receive after they become citizens. *Id.* Therefore, in the state's voter databases, a naturalized citizen may also have an alien registration number listed next to their name which, if wrongly screened, may flag them as noncitizens. *Id.* If federal officials obtain this information as part of an unredacted statewide voter list and run SAVE database checks, naturalized citizens are more likely to be erroneously labeled as noncitizens. *Mi Familia Vota v. Fontes*, 129 F.4th 691, 723 (9th Cir. 2025) (noting disproportionate impact on naturalized citizens' right to vote when local registrars run immigration numbers of naturalized citizens or noncitizens through SAVE database because they have "reason to believe" a person is not a citizen). This threat is not theoretical—in states that have handed over their voter rolls to DOJ, the use of this data in the SAVE database has led to "persistent mistakes, particularly in assessing the status of people born outside the U.S.," with hundreds of voters "being mistakenly flagged as

noncitizens." Jen Fifield & Zach Despart, *A federal tool to check voter citizenship keeps making mistakes. It led to confusion in Texas.*, Texas Tribune (Feb. 13, 2026), https://www.texastribune.org/2026/02/13/save-voter-citizenship-tool-mistakes-confusion/.

The same is true for country of birth, another "field" that could be disclosed as part of an unredacted file. Because naturalized citizens are typically born outside the United States, they are more likely to be flagged as noncitizens if country of birth is used as a proxy or trigger for further scrutiny. Consequently, despite DOJ's assertion that it seeks the unredacted list to determine Arizona's compliance with National Voter Registration Act ("NVRA") and Help America Vote Act ("HAVA"), fears abound among LULAC's membership that DOJ may use the information to target them as "illegal voters," especially those who are foreign-born or who have immigration-related numbers listed in their records. Ex. A, Proaño Decl. ¶ 26. For LULAC's membership, this is alarming, confusing, and has had a concrete chilling effect on registration. *Id.*

Moreover, some of LULAC's members who are eligible voters live in mixed-status families (e.g., U.S. citizens living with undocumented relatives). DOJ's request for "all fields" in the statewide voter file could include father's name or mother's maiden name, which in turn would provide the federal government with identifying information about family members. *Id.* ¶ 31. LULAC's members worry that such information could be used by immigration authorities to investigate or locate their relatives for immigration purposes, despite DOJ's ostensible purpose to investigate violations of NVRA and HAVA. *Id.* In the Latino communities that have experienced aggressive immigration enforcement, perception and trust matter. And the possibility—real or perceived—that their sensitive voter registration data could be shared for immigration enforcement has discouraged LULAC's members in these communities from registering or voting in the future. *Id.* ¶ 32.

Finally, DOJ's request for the unredacted voter file has resulted in a chilling effect because many community members believe that even eligible voters should keep themselves and their loved ones safe by not voting. *Id.* ¶ 33. They fear that voting could

expose the immigration statuses of family members and friends. *Id.* These fears have chilled the participation of newer citizens, first-time voters, and voters who are a part of mixed-status families in Latino communities across the state. *Id.*

**II.    DOJ's insufficient "statement of the basis and purpose" for its demand compounds the chilling effect on LULAC's membership and constituency.**

The chilling effects of DOJ's demand are compounded by the fact that it appears to have no basis to make that demand. Title III of the Civil Rights Act requires DOJ, when seeking records, to provide "a statement of the basis and purpose" of its demand. 52 U.S.C. § 20703. But DOJ has failed to articulate either, which further indicates that its real purpose in seeking Arizona's unredacted voter file is for purposes unrelated to facilitating voter participation.

As an initial matter, "basis" and "purpose" are distinct concepts under Title III. In *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962), the Fifth Circuit explained that the "basis" refers to the underlying information providing grounds for the complaint—why the Attorney General believes there is a violation of federal civil rights law—while the "purpose" explains how the requested records would help determine whether a violation exists. *Id.* at 228 n.4; *see In re Coleman*, 208 F. Supp. 199, 199-200 (S.D. Miss. 1962), *aff'd sub nom. Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963). Further, any stated basis or purpose should be related to a potential violation of federal civil rights law. *See e.g.*, *United States v. Oregon*, No. 6:25-CV-01666-MTK, 2026 WL 318402, at *8 (D. Or. Feb. 5, 2026) (finding no authority for the proposition that "basis" means a violation of any federal statute, regardless of its relation to civil rights violations.); *Id.*, 2026 WL 318402, at *10 (holding "purpose" required in a demand for records under Title III must relate to a purpose of investigating violations of individuals' voting rights). Here, DOJ seeks "the current electronic copy of Arizona's computerized statewide voter registration list, with *all fields*," for "the Attorney General's investigation into Arizona compliance with federal election law, particularly the NVRA and HAVA." Doc. 1 ¶ 9 (italics in original). But DOJ has not articulated any "basis"—no underlying information providing grounds for its

investigation— for why an investigation is necessary to evaluate Arizona's purported non-compliance with "federal election law, particularly Doc. 1 ¶ 9.

Even if enforcement of the NVRA and HAVA qualified as a valid "basis" to demand the statewide voter registration list, the Complaint does not explain DOJ's "purpose," and specifically why DOJ needs *every field* in the list or an entirely unredacted version of it. Under the NVRA and HAVA, states are charged with determining voter eligibility and conducting list maintenance. 52 U.S.C. § 21083(a)(2)(A) (section of HAVA requiring states to maintain computerized statewide voter registration list); 52 U.S.C. § 20507(a)(4), (c)(1) (section of NVRA describing obligation of states to conduct general program that makes reasonable effort to remove ineligible voters from voter rolls). In line with these statutes, Arizona continues to implement measures for state and local officials to determine registration eligibility and ensure that the rolls are current and accurate, making it even less clear why DOJ needs sensitive personal identifiers. *Mi Familia Vota*, 129 F.4th at 723–24 (observing states are authorized to investigate the citizenship status of registered voters) (relying on *Arizona v. Inter Tribal Council of Ariz.*, 570 U.S. 1, 17 (2013)).

Further, DOJ's claim that it must investigate Arizona's compliance with federal law, including NVRA and HAVA—stands in sharp contrast to officials' public statements about how DOJ intends to use voter roll data.

Leaders within DOJ's Civil Rights Division have publicly said that the voter roll data is "being screened for ineligible voter entries" and the Assistant Attorney General for Civil Rights confirmed DOJ "had checked 47.5 million voter records." Sam Levine, *Alarm as Trump DOJ pushes for voter information on millions of Americans*, The Guardian (Jan. 15, 2026), https://www.theguardian.com/us-news/2026/jan/15/justice-department-voter-information; Devlin Barrett and Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times (Sept. 9, 2025), https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html; *Weber*, 2026 WL 118807, at *11. And the *Oregon* court also found suspicious that Attorney

General Pam Bondi's letter to Minnesota's governor related to immigration enforcement also demanded Minnesota's voter registration lists. *Oregon*, 2026 WL 318402, at *11.

DOJ has since confirmed that it is sharing lists with DHS and developing a national voter database. *See* Tr. 120:6–121:2, *Weber*, No. 2:25-cv-09149, ECF No. 92; Jonathan Shorman, *DOJ Is Sharing State Voter Roll Lists with Homeland Security*, Stateline (Sept. 12, 2025), https://stateline.org/2025/09/12/doj-is-sharing-state-voter-roll-lists-with-homeland-security/. The sharing of this information comes while DHS has expanded its own database to check a person's citizenship status. *See* Levine, *supra* DHS has run nearly 50 million voter registrations through that database and referred approximately 10,000 people for further investigation of noncitizenship. Alexandra Berzon & Nick Corasaniti, *Initial Review Finds No Widespread Illegal Voting by Migrants, Puncturing a Trump Claim*, N.Y. Times (Jan. 14, 2026), https://www.nytimes.com/2026/01/14/us/politics/noncitizen-voters-save-tool.html.

The clear dissonance between DOJ's claimed "purpose" in demanding the voter data and its subsequent admission of its actual use of the data has led some courts to conclude that DOJ's asserted purpose is pretextual. *United States v. Weber*, No. 2:25-cv-09149, 2026 WL 118807, at *10 (C.D. Cal. Jan. 15, 2026) ("[t]he Court is not required to accept pretextual, formalistic explanations untethered to the reality of what the government has said outside of the courtroom"); *United States* v. *Oregon*, No. 6:25-cv-01666, 2026 WL 318402, at *11 (D. Or. Feb. 5, 2026) (noting DOJ has "continued to engage in conduct raising suspicion about the purposes for which it seeks statewide unredacted voter registration lists").

Against this backdrop and amid an increase in violent immigration raids, which disproportionately affect Latino communities and where even U.S. citizens have been detained and subjected to inhumane conditions—that Latino voters are increasingly unwilling to engage with the federal government in any way, even through a voter registration form. Faced with such risks, many of LULAC's Latino members have

experienced a chilling effect on the civic participation that federal voting rights laws were meant to protect. Ex. A, Proaño Decl. ¶ 32.

### III.   DOJ's attempted use of Title III runs counter to the history and purpose of the Civil Rights Act.

Given the chilling effect of DOJ's demand, and the lack of justification for that demand, it is clear that DOJ's use of Title III runs counter to the history and purpose of this section of the Civil Rights Act. The history of Title III shows that the statute was designed to promote voter participation, not discourage it. Congress enacted the Civil Rights Acts of 1957 and 1960 (of which Title III is a part) to "satisfy the clear commands of the Fifteenth Amendment" by confronting racial discrimination in voting. *South Carolina v. Katzenbach*, 383 U.S. 301, 309–13 (1966). Title III, in particular, was intended to provide a tool to allow DOJ to investigate states and local efforts to destroy or hide voting and registration records of Black voters to evade federal investigation.

The problem of records destruction at the state and local level was well-documented. Historical accounts describe how "some southern officials, in order to hamper investigations by the Department of Justice and the Civil Rights Commission, had been destroying or impounding voting and registration records."  Daniel M. Berman, *A Bill Becomes a Law: Congress Enacts Civil Rights Legislations* 9 (2d ed. 1966). Even where records were not destroyed, states would often refuse to provide them to the federal government, stonewalling the government's efforts to investigate race-based disenfranchisement. 1959 U.S. Comm'n on Civil Rights Rep. 137.

Title III sought to solve this specific problem by "gi[ving] the Attorney General access to local voting records" so that the federal government could investigate race-based discrimination in voting. *Katzenbach*, 383 U.S. at 313. House debates on Title III make plain this specific purpose. As one representative put it on the floor of the House in 1960:

> Title III of the bill under consideration pertains to Federal election records. Nobody can deny, Mr. Chairman, that in certain parts of the country, colored citizens are simply not permitted to vote. The subterfuges range from the ingenious to the primitive, but the end

11

> result is the same: if your skin is black you cannot vote, no matter what the Constitution says. . . .
>
> Title III is, of course, merely a beginning. It does no more than facilitate investigations regarding denials of the right to vote. The necessity for a Federal law requiring the retention of Federal election records, and authorizing inspection of such records in certain specified circumstances, was demonstrated during the hearings of the Commission on civil rights. In Alabama, State officials threw up roadblocks in the way of the Commission with a degree of enthusiasm that was worthy of nobler endeavors. While the Civil Rights Commission was in the midst of examining the election records of Alabama counties, the legislature of that State simply passed a bill authorizing the destruction of rejected application forms. Thus the tracks were covered, and nobody would ever know who was denied the vote or why. Obviously, the 15th amendment would be reduced to a dead letter if that State law were allowed to stand.

106 Cong. Rec. 5309 (1960) (statement of Rep. Addonizio), https://www.govinfo.gov/content/pkg/GPO-CRECB-1960-pt4/pdf/GPO-CRECB-1960-pt4-9-2.pdf. The House Committee referred to Title III as "an essential step in the process of enforcing and protecting the right to vote." *State of Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala. 1960) (citing H.R. Rep. No. 86-956, at 7 (1959)), *aff'd sub nom. Dinkens v. Att'y Gen. of United States*, 285 F.3d 430 (5th Cir. 1961); *see also* Judge J. Michelle Childs, *Voting Rights: Mechanism for Social Change*, 76 Ala. L. Rev. 603, 609–10 (2025). The goal of Title III was simple: addressing racial discrimination in voting to provide greater access to the franchise.

Throughout the early 1960s, that goal was met. Multiple United States Attorneys General relied on Title III to investigate and combat race-based voter discrimination following passage of the Civil Rights Act. By mid-1961, the Attorney General requested voting records in 26 southern counties. *See* 1961 U.S. Comm'n on Civil Rights Rep. 97. These investigations uncovered evidence of discriminatory voting practices that resulted in DOJ filing 19 voter discrimination cases against those counties by the end of 1962. Childs, *supra*, at 610. Such "frequent[] and effective[]" employment of Title III demonstrated its primary purpose as an investigative tool to assist the federal government in combatting "discriminatory denials of the right to vote." 1961 Report, *supra*, at 99. But today, DOJ attempts to use Title III to gain unfettered access to Arizona's voter rolls,

12

outside of any specific investigation and without any evidence of malfeasance. This attempt is not facilitating the right to vote; it is chilling it.

Title III was written to eliminate barriers to voting. DOJ's current demand for Arizona's unredacted statewide voter file instead erects barriers by deterring eligible citizens from registering to vote and from voting. Because DOJ's demand has the opposite effect of what Congress intended— erecting new barriers to the franchise rather than dismantling old ones—it is wholly inconsistent with Title III's purpose.

## CONCLUSION

For the foregoing reasons, LULAC respectfully requests that the Court grant the Motion to Dismiss for Failure to State a Claim filed by Adrian Fontes in his official capacity as Arizona Secretary of State, ECF No. 25, and deny the Motion to Compel filed by DOJ, ECF No. 26.

13

DATED this 16th day of March, 2026.

Respectfully submitted,

/s/ Joshua J. Messer
David B. Rosenbaum
Joshua J. Messer
OSBORN MALEDON, P.A.
2929 North Central Avenue, Suite 2000
Phoenix, Arizona 85012
drosenbaum@omlaw.com
jmesser@omlaw.com

Norman Eisen[+]
Tianna Mays*
Pooja Chaudhuri*
Lindsay Zimliki*
Sofia Fernandez Gold*
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE, Ste.15180
Washington, D.C. 20003.
Tel: (202) 594-9958
norman@democracydefenders.org
tianna@democracydefenders.org
pooja@democracydefenders.org
lindsay@democracydefenders.org
sofia@democracydefenders.org

Timothy J. Ford*
Margaret Spitzer*
**DILWORTH PAXSON LLP**
1650 Market Street, Suite 1200
Philadelphia, PA 19103
Tel.: (215) 575-7000
tford@dilworthlaw.com
mpersico@dilworthlaw.com

*Attorneys for Amicus Curiae,
the League of United Latin American
Citizens*

*\* Admission pro hac vice forthcoming*
[+] *Admitted pro hac vice*

14